# DEPARTMENT OF ADMINISTRATION, etc., et al. v. CITY OF ST. PETERSBURG, et al.

Case No. 83-6311-17

Sixth Judicial Circuit, Pinellas County

January 15, 1985

## APPEARANCES OF COUNSEL

**Stephen Moran** for plaintiffs.

**Thomas W. Reese** and **Mary V. Halpin** for defendants, S.O.S., Inc.

## OPINION OF THE COURT

FRED L. BRYSON, Circuit Judge.

This matter having come on before the Court is a motion for award of attorneys' fees pursuant to Section 73.091, Florida Statutes, filed herein by THOMAS W. REESE (REESE) and MARY V. HALPIN (HALPIN).

The Court received and heard testimony and argument January 20, 1984, May 18, 1984, November 19, 1984 and December 18, 1984, from witnesses for the Petitioner, DIVISION OF ADMINISTRATION, STATE OF FLORIDA, DEPARTMENT OF TRANSPORTATION (DOT), and Movants, REESE and HALPIN.

DOT, REESE and HALPIN have also each provided the Court with

memorandums of law on the general issue of the propriety of attorneys' fees in the instant case, and Supplemental Memorandums of Law on the specific issue of attorneys' fees in inverse condemnation cases.

During the pendency of this matter, REESE and HALPIN also filed written motions:

a) to strike the partial testimony of James J. Richardson; and

b) for this Court to take judicial notice of ten (10) Florida appellate cases, two (2) federal administrative regulations and the Statewide Marina Siting Policy of the Florida Board of Trustees of the Internal Improvement Trust Fund.

REESE and HALPIN's motion to take judicial notice is hereby granted. Their motion to strike the partial testimony of James J. Richardson is denied.

On November 27, 1984, the Court entered a 15 page Order Awarding Attorneys' Fees of $90,000.00 to REESE and HALPIN. On November 28, 1984, DOT filed a Motion for Rehearing of Proposed Order seeking correction of details of the November 27 Order. This motion was heard on December 18, and granted to the extent set forth herein.

Pursuant to Section 90.202(6), Florida Statutes, this Court takes judicial notice of the court records of:

1. The Circuit Court for Pinellas County, Florida Case No. 83-8785-13, S.O.S., Inc. v. City of St. Petersburg and State of Florida, Department of Transportation; and

2. The United States District Court, Middle District of Florida, Tampa Division, Case No. 83-202-TPA-CIV-17, S.O.S., Inc. v. Elizabeth H. Dole, et al.

### Remaining Issues Before the Court

The remaining issues before the Court at this time are as follows:

1. Whether the clients of REESE and HALPIN have a property or ownership interest in the subject property which entitles them to have DOT pay any of their attorneys' fees pursuant to Section 73.091, Florida Statutes, or the Florida Constitution.

2. Whether the clients of REESE and HALPIN are entitled to have DOT pay their attorneys' fees for work performed before this suit was filed but after the subject condemnation was imminent.

3. What constitutes a reasonable attorneys' fee for REESE and HALPIN for their efforts in defeating the proposed taking.

## Finding of Facts

This case involves DOT's petition to condemn portions of the City of St. Petersburg's (CITY) Maximo Park in south St. Petersburg for use as a limited access highway interchange at the juncture of Interstate 275 and Pinellas Point Drive South. Located within the portion of Maximo Park which the DOT proposed to condemn is the Defendant's O'Neill's Marina and Boat Basin (O'Neill's). The proposed condemnation would have taken the greater part of O'Neill's including the adjacent dockside businesses of Divers Den, Skyway Jack's Skyway Restaurant, Dave's Mobile Marine, Don's Marine Boat Sales, and the Bait Bucket.

On September 29, 1980, DOT prepared a Final Environmental Impact/Section 4(f) Statement (EIS/4(f)) for the Federal Highway Administration concerning the proposed Pinellas Point Drive South/ Interstate 275 interchange. This document concluded that there was no feasible and prudent alternative design for the Pinellas Point Drive South interchange which would not require the taking of the portion of Maximo Park which included O'Neill's. This DOT EIS/4(f) statement was approved by the Division Administrator of the Federal Highway Administration on February 17, 1981.

On February 26, 1981, DOT filed a dredge and fill permit application with the Pinellas County Water and Navigation Control Authority (PCWNCA) requesting permission to fill in O'Neill's Boat Basin.

On March 4, 1982, DOT filed a dredge and fill permit application with the State of Florida, Department of Environmental Regulation (DER) requesting permission to fill in O'Neill's Boat Basin.

In early May of 1982, after the DOT's proposed taking of O'Neill's Boat Basin became imminent the lessee of O'Neill's and several of his sublessees retained REESE and HALPIN to represent them in an effort to defeat the taking. These clients advised REESE and HALPIN that their sole interest was in defeating the taking since the existence of O'Neill's was critical to their various commercial fishing and dockside businesses. These businesses which operated at O'Neill's included numerous commercial shrimp boats, net boats, crab boats, recreational sport fishing guide boats, marine repair shops, scuba diving shops, bait shops and a restaurant.

The nature of the property interest of these clients in the subject is complex. From 1952 to 1981, the lessee, Hap O'Neill, Inc., d/b/a O'Neill's Skyway Boat Basin, leased the marina and dockside buildings from the CITY pursuant to a series of five (5) year written leases. These written leases gave Hap O'Neill, Inc. an express right to renew

114

the lease. In 1981, the last written lease expired and was not formally renewed because of the imminent condemnation of the property by DOT. The lessee and the numerous sub-lessees remained in possession of the premises as tenants at will and paid monthly rent with the permission of the CITY.

Upon being retained, REESE and HALPIN immediately proceeded to organize these individuals into a not-for-profit corporation known as S.O.S., Inc., and began defending against the imminent taking of O'Neill by developing the twin defense pillars of *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 411, 28 L.Ed 2d 136, 150 (hn 7), 91 S.Ct. 814 (1971) and *Seadade Industries, Inc. v. Florida Power & Light Co.*, 245 So.2d 208, 214 (hn 3-6) (Fla. 1971).

The *Overton Park* defense was based upon 49 USC Section 1653(f) and 23 USC Section 138 which provide that a federally funded highway such as Interstate 275 cannot take public parkland or public recreational facilities such as Maximo Park, unless the Secretary of the United States Department of Transporation (Fed DOT) makes a *written* finding that "no feasible or prudent alternative" to the use of parklands exists. In order for the Secretary of the Fed DOT to make such a finding, she would have had to find, which she never did:

a) that "as a matter of sound engineering practice it would not be feasible to build the highway along any other route." *Citizens to Preserve Overton Park v. Volpe*, supra, at 28 L.Ed 2d 136, 150 (hn 7); and

b) that to build the highway with a design to avoid encroaching on Maximo Park would be imprudent because "of truly unusual factors" or excessive costs or "community disruption resulting from alternative routes reached extraordinary magnitudes." *Ibid*, at 28 L.Ed 2d 151 (hn 8-10).

The *Seadade* defense rested on the Florida Supreme Court's holding that

". . . where independent governmental agencies charged with safeguarding natural resources must ultimately approve a project involving condemnation, the condemning authority must demonstrate a reasonable probability of obtaining approval and it must also demonstrate that the condemnation will not result in irreparable harm should the approvals be denied." Supra at 215 (hn 6)[1]

---

[1] See, *Florida Power Corporation v. Gulf Ride Council*, 385 So.2d 115 (Fla. 2d DCA 1980) (Citing the *Seadade* decision, the Second District Court of Appeal held that a power company which sought to condemn a route for a high voltage power transmis-

In the instant case the *Seadade* defense revolved around the fact that DOT was required to obtain permits and approval from four separate governmental agencies charged with safeguarding natural resources. These agencies were:

a) the Pinellas County Water and Navigation Control Authority (PCWNCA);

b) the Florida Department of Environmental Regulation (DER);

c) the Board of Trustees of the Internal Improvement Trust Fund (Trustees);[2] and

d) the United States Army Corps of Engineers (COE).

In order to obtain a permit from PCWNCA, DOT was required to demonstrate that:

a) it owned the marina and

b) that filling it would not have a detrimental effect upon the free use and access to navigable waters and waterways.

To obtain the separate permits from DER and the Trustees, DOT was required to:

a) demonstrate compliance with the Boca Ciega Bay Aquatic Preserve Act, Section 258.16(3)(b), Florida Statutes, which prohibits the proposed filling activity;

b) demonstrate that the filling of the marina was "clearly in the public interest" as required by DER's Outstanding Florida Water Rule,[3] and

c) demonstrate that the project complied with the Statewide Marina Policy and Marina Siting Policy which provided for the continued use of existing marinas (see footnote 2 above).

---

sion line which bisected a recreational and wildlife refuge rather than utilizing one of the available alternative routes, abused its discretion). Accord, *Florida Power & Light Co. v. Berman*, 429 So.2d 79 (Fla. 4th DCA 1983).

[2] The Governor and Cabinet sit as the agency head of the Trustees and are the managers of the Boca Ciega Bay Aquatic Preserve wherein O'Neill's is located. As manager of the aquatic preserve, the Trustees must enforce their statewide Marina Policy and Marina Siting Policy which has prohibitions against filling existing marinas for a nonwater dependent use such as the proposed interstate highway.

[3] FAC 17-4.242. See *Doheny v. Grove Isle, Ltd.*, 442 So.2d 966 (Fla. 1st DCA 1983); *Grove Isles v. Bayshore Homeowner's Assn.*, 418 So.2d 1046 (Fla. 1st DCA 1983), cert denied, 430 So.2d 451 (Fla. 1983); and *Grove Isle, Ltd. v. Department of Environmental Regulation*, 454 So.2d 571 (Fla. 1st DCA 1984).

**116**

In order to obtain a permit from COE, DOT was required to demonstrate that the project was:

a) in the public interest and

b) there was no practical alternative to filling wetlands (i.e., the marina). 40 CFR Section 230.10(a)(1).

The Section 404(b) guidelines for the issuance of a COE dredge and fill permit provided that:

"An alternative is practical if it is available and capable of being done after taking into consideration cost, existing technologoy and logistics in light of overall project purposes." 40 CFR Section 230.10(a)(2).

The first necessary step REESE and HALPIN took in developing their *Seadade* defense was to appear at the May 16, 1982, PCWNCA hearing on DOT's dredge and fill permit application.[4] At this hearing the PCWNCA properly declined to proceed with the processing of DOT's permit application until DOT obtained title to O'Neill's as required by the statute which created the PCWNCA.

DOT then began negotiating with the CITY to purchase O'Neill's from the CITY. By mid-July, DOT and the CITY had developed a proposal for the CITY to sell to DOT that portion of Maximo Park where O'Neill's is located, without obtaining the approval of a majority of voters in a city-wide referendum as required by the City Charter of the City of St. Petersburg.[5] It is the express finding of this Court that at this point in time the DOT and the CITY were in conspiracy to violate the City Charter and the mandates of the *Overton Park* decision. In order to defend against this conspiracy and prevent such an illegal sale which would have resulted in the eviction of the clients of REESE and HALPIN, REESE and HALPIN properly and necessarily filed suit in Pinellas County Circuit Court on behalf of S.O.S., Inc., against the CITY and DOT (Case No. 83-8785-12). The suit requested declaratory and injunctive relief against the CITY and DOT on the issues of:

a) whether Section 1.02 of the City Charter of the CITY prohibited

---

[4] It was of great importance for REESE and HALPIN to immediately establish their various defenses since many of the environmental permits are inter-related.

[5] Section 1.02 of the applicable City Charter provision provided that the CITY cannot sell, donate or lease for a term in excess of five years, any city-owned real estate contiguous to various waterbodies, including Boca Ciega Bay, except after specific authorization by a majority vote in a city-wide referendum.

it from selling O'Neill's to DOT without the approval of a majority vote in a citywide referendum, and

b) whether Section 1.02 of the City Charter required the CITY to defend any condemnation action concerning Maximo Park filed by DOT.

During the pendency of this action, extensive necessary and beneficial discovery was conducted by REESE and HALPIN relating to their *Seadade* and *Overton Park* defenses. Both the CITY and DOT vigorously defended the suit on all points even though the City Attorney testified in this Court on January 20, and on May 19, that he had advised both his superiors and DOT officials that the City Charter prohibited a sale of the marina unless referendum approval from the voters of the CITY was obtained.

On January 26, 1983, the Pinellas County Circuit Court, Honorable Mark R. McGarry presiding, granted S.O.S., Inc.'s motion for summary judgment and observed that "the ordinance [City Charter] is written in plain English that any fool can understand, and it says there must be a referendum." (Transcript of hearing, pg. 30 L18-23). The Court specifically enjoined the CITY from selling O'Neill's without first complying with the referendum requirement of the City Charter. The Court also held that Section 1.02 of the City Charter required the CITY to defend any condemnation action of Maximo Park of O'Neill's.

Shortly after this ruling, DOT officials personally advised REESE and HALPIN and also publicly stated that DOT intended to proceed, first, to construct the proposed Pinellas Point Drive South/Interstate 275 Interchange as designed to the edge of the park, and then seek to condemn the park and marina property. Such an action would have eliminated, and was intended by DOT to eliminate, all design alternatives which were then available to avoid use of parkland and the filling of the marina.

In early March of 1983, in a necessary effort to preserve alternatives, REESE and HALPIN filed suit in the United States District Court for the Middle District of Florida, on behalf of S.O.S., Inc.[6] against the Secretary of the Fed DOT and the Secretary of DOT. This suit sought declaratory and injunctive relief on the grounds that the state and federal defendants had not prepared a proper EIS/4(f) statement (a variation of the *Seadade* defense), and that feasible and prudent design

---

[6] By this time the membership of S.O.S., Inc. consisted of several hundred members of the general community in addition to the lessee and numerous sublessees at O'Neill's.

118

alternatives existed which did not require the taking of any parkland and would leave the marina intact (the *Overton Park* defense). The filing of this suit ultimately forced DOT to file the instant condemnation proceedings.

Both defendants defended this suit on all issues. During this suit REESE and HALPIN conducted further necessary and beneficial discovery relating to their *Seadade* and *Overton Park* Section 4(f) defenses.

During this time REESE and HALPIN retained the services of a traffic engineering consultant who prepared several design alternatives which would not encroach on any parkland. REESE and HALPIN also contacted numerous individuals at DER, the Trustees, the COE, and PCWNCA and advised them of the numerous fatal deficiencies in DOT's permit applications.

On June 26, 1983, DOT filed the instant condemnation action against the CITY, Hap O'Neill, Inc., and all of the sublessees at O'Neill. REESE and HALPIN represented 24 of the sublessees named and cited as Defendants in this condemnation petition.

On July 27, 1983, approximately one month after DOT filed this condemnation action, and prior to any Order of Taking hearing in this Court, the DOT recognized REESE and HALPIN had built an air-tight case against them and agreed to redesign the Pinellas Point South/Interstate 275 interchange to avoid any taking of parkland and leaving the marina intact. This new design was for all practical purposes identical to the design suggested by REESE and HALPIN.

Section II(c) of the July 27 Stipulation of Settlement in this cases provides that DOT will

"Pay for all present co-defendants' reasonable costs and attorneys' fees incurred in the above-styled condemnation litigation. Should agreement not be reached on the amounts to be paid, the parties will submit the matter to the Circuit Court for determination."

Section III of the July 27 Stipulation of Settlement names "the public interest group, S.O.S., Inc." as co-defendant and provides that S.O.S., Inc. will:

"A. Dismiss all related Petitions or Complaints against DOT and federal agencies in administrative, state Circuit, or Federal courts.

"B. Withdraw all opposition to the I-275/Pinellas Point Drive interchange Order of Taking as redesigned. . .

"C. Agree to support DOT and CITY in obtaining all necessary government approvals for the new design. . . . ."

It is the finding of this Court that these provisions of the Stipulation of Settlement agreement recognize the interrelationship of all the various actions by REESE and HALPIN and provides a stipulated basis separate and additional from Section 73.091, Florida Statutes for REESE and HALPIN to collect attorneys fees for all of their time and efforts in the various cases. This Court specifically finds that DOT's argument that this Stipulation of Settlement agreement limited and restricted REESE and HALPIN to attorney's fees only for their time and efforts spent since the filing of the above styled Case No. 83-6311-17, is meritless and without any factual or legal foundation.

On August 3, 1983, DOT voluntarily dismissed its condemnation petition in this case.

On November 11, 1983, REESE and HALPIN filed the instant motion for award of attorneys' fees. At the January 20 and May 18 hearings on this motion, REESE introduced evidence of 348.7 hours of work defending the taking since May of 1982. HALPIN introduced evidence of 264.5 hours of work defending the taking. Expert witness testimony was received that a reasonable attorney's fee for REESE and HALPIN's efforts was $90,000.00. This expert opinion was based upon the factors set forth in Section 74.092, Florida Statutes.

It is the finding of this Court that all of REESE and HALPIN's efforts described above were necessary and proper in the defense of the DOT's proposed imminent taking of O'Neill's and are compensable pursuant to both Section 73.091, Florida statutes and the Stipulation of Settlement. It is further found that a reasonable attorney's fee for REESE and HALPIN's efforts is $90,000.00.

Pursuant to the Stipulation of Settlement reached in this case, REESE and HALPIN's clients have dismissed Fla. DOAH Case No. 83-125, and the Federal District Court also has entered an Order of Administrative Closure of its file. In its Order of Administrative CLosure of the file, the Federal District Court noted that:

"[a]pparently, there is still disagreement regarding issues of attorney's fees for this case and a companion case in the State Court system. This Court stands prepared to rule regarding attorney's fees should that issue be presented to it in the future. . . ."

To date REESE and HALPIN have not requested attorney's fees in the federal court. Any request in the federal court would be pursuant to the Equal Access of Justice Act (28 USC Section 2414(d)(1)(A)), which provides that private parties who prevail in litigation against the United States government shall be awarded fees and costs against the

120

government, unless the position of the United States was substantially justified.

Since the $90,000.00 attorneys' fee award granted by this Order against the DOT includes compensation to REESE and HALPIN for their time and efforts in the Federal District Court, fairness dictates that REESE and HALPIN apply to the Federal District Court for attorneys' fees and costs against the Fed DOT, and that any and all attorneys' fees and costs recovered from the Fed DOT be deducted from the $90,000.00 fee awarded herein. Thus, DOT shall pay the sum of $90,000.00 into the registry of the Clerk of the Pinellas County Circuit Court within 20 days of entry of this Order. The Clerk is not to disburse any of this money until the Federal District Court has ruled upon REESE and HALPIN's yet to be filed request for attorneys' fees. Once the Federal District Court has ruled on this matter, the Clerk shall disburse to REESE and HALPIN the sum of $90,000.00, minus the sum of the fees recovered in the Federal District Court, if any, from the Fed DOT. REESE and HALPIN shall also be entitled to 12% annual interest on the money on deposit with the Clerk.

## Conclusions of Law

The clients of REESE and HALPIN are owners of the property in question in the constitutional sense and are entitled to have the DOT pay their attorneys' fees pursuant to Section 73.091, Florida Statutes, and the Florida Constitution. *Pensacola Scrap Processors, Inc. v. State Road Department*, 188 So.2d 38, 42 (hn 3, 4) (Fla. 1st DCA 1966) cert. denied 192 So.2d 494 (Fla. 1966); 21 Fla.Jur. 2d Eminent Domain Section 72, Leasehold interests. See also, *Mikos v. King's Gate Club, Inc.*, 426 So.2d 74, 75 (Fla. 2d DCA 1983).

Additionally, REESE and HALPIN are entitled to be compensated for their work performed before this suit was filed, but after condemnation was imminent, which in this situation constitutes all of REESE and HALPIN's work. *State Department of Transporation v. Grice Electronics, Inc.*, 356 So.2d 7 (Fla. 1977). This principle has been repeatedly applied in inverse condemnation cases to allow property owners to recover their attorney's fees for time expended in inverse condemnation suits to force condemning authorities to institute condemnation proceedings. *State Road Department v. Lewis*, 190 So.2d 599,600 (hn 2) (Fla. 1st DCA 1966), cert. dismissed, 192 So.2d 499 (Fla. 1966); *City of Jacksonville v. Schumann*, 223 So.2d 749 (Fla. 1st DCA 1969); *Broward County v. Bouldin*, 114 So.2d 737, 741 (hn 8) (Fla. 2d DCA 1959); *County of Volusia v. Pickens*, 435 So.2d 247 (Fla.

121

5th DCA 1983); *State Department of Natural Resources v. Gables-By-The-Sea, Inc.*, 374 So.2d 582, 583, (hn 1, 2) (Fla. 3rd DCA 1979); 21 Fla. Jur 2d, Eminent Domain Section 165 (Costs, including attorney's fees, are appropriately awarded as part of damages in inverse condemnation actions.")

In these condemnation cases, property owners are entitled to attorney's fees once the taking or condemnation was imminent. *Ibid*. The best example of this principle is, *State Department of Natural Resources v. Gables-By-The Sea, Inc.*, supra, where the Court found "the date of taking, i.e. when the condemnation was imminent," to be January 18, 1973, the date COE concurred with state agencies in denying Gables' dredge and fill permits for the subject property. See, *Askew v. Gables-By-The Sea, Inc.*, 333 So.2d 56, 61 (Fla. 1st DCA 1976). In the Gables case compensation was granted for five (5) years of legal work in seven (7) different levels of state and federal trial and appellate courts. *State Department of Natural Resources v. Gabes-By-The Sea, Inc.*, supra.

Additional authority for awarding attorneys' fees for work performed in defeating a proposed taking is *City of Miami v. Manilow*, 253 So.2d 910, 911 (hn 2) (Fla. 3rd DCA 1971), where the Court awarded compensation for attorney's time expended to defeat two bond elections held by the City to finance a proposed condemnation.

Attorneys' fees have also been granted for work in ancillary circuit court proceedings under state law to recover replacement housing allowance. *State Department of Transportation v. Shaw*, 303 So.2d 75, 77 (hn 2) (Fla. 1st DCA 1974).

The case of *Division of Administration, Department of Transportation v. Grant Motor Co.*, 345 So.2d 843 (Fla. 2d DCA 1977), is distinguishable because the relief sought in the *Grant* case was a form of damages not within the jurisdiction of the Circuit Court, thus not subject to Section 73.091, Florida Statutes. The relief sought by REESE and HALPIN in the instant matter was to defeat the imminent taking, a form of relief clearly within the jurisdiction of the Circuit Court. In order to properly preserve their *Seadade* and *Overton Park* defenses, REESE and HALPIN necessarily had to take all of the actions they took, and all of their time and effort is compensible under Section 73.091, Florida Statutes. The controlling precedent of the Second District Court of Appeal is therefore *Broward County v. Bouldin*, supra (hn 8), wherein the Court teaches that time spent compelling the condemnor to file condemnation proceedings is compensible in awarding a fee in the condemnation case. *State Road Depart-*

*ment v. Lewis,* supra; *City of Jacksonville v. Schumann,* supra; *County of Volusia v. Pickens,* supra.

In the instant case, the condemnation or taking became imminent upon the preparation and acceptance of the EIS/4(f) Statement by DOT and Fed DOT, and the DOT's application for dredge and fill permits for the marina. All of REESE and HALPIN's efforts to defeat the taking occurred after these events, were necessary, and are thus compensable.

Additionally, independent of Section 73.091, Florida Statutes, REESE and HALPIN have a stipulated basis to attorney's fees for all of their time and effort in defending the imminent taking.

The basis for computing the attorney's fees to be awarded to REESE and HALPIN is not strictly an hourly rate. Consideration must also be given to factors such as the abilities of REESE and HALPIN, the complexity of the case, the results achieved, etc. *Division of Administration v. Denmark,* 356 So.2d 15 (Fla. 4th DCA 1978); Section 73.092, Florida Statutes. The instant case was exceedingly complex and REESE and HALPIN achieved exactly what their clients desired, to defeat the taking, a result rarely seen in interstate highway condemnation proceedings. This Court finds that REESE and HALPIN presented a masterly defense of their clients' case in the face of vigorous opposition by the DOT. This Court concludes that a reasonable attorneys' fee award for REESE and HALPIN in this case is $90,000.00.

Accordingly, it is hereby

ORDERED AND ADJUDGED that attorneys' fees in the amount of $90,000.00 are assessed against DOT. DOT shall deposit said sum with the Clerk of the Pinellas County Circuit Court within 20 days of entry of this Order. The Clerk is not to disburse this money to REESE and HALPIN until the Federal District Court has ruled upon REESE and HALPIN's yet to be filed request for attorneys' fees in that Court. Once the Federal District Court has ruled on this matter, the Clerk shall disburse to REESE and HALPIN the sum of $90,000.00 minus the sum of the fees recovered by REESE and HALPIN in the Federal District Court, if any. REESE and HALPIN shall also be entitled to 12% annual interest on the money on deposit with the Clerk.